1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN H. CHACON,

               Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

               Defendant.

CASE NO.    C06-5621RBL-KLS

REPORT AND
RECOMMENDATION

Noted for November 9, 2007

Plaintiff, John H. Chacon, has brought this matter for judicial review of the denial of his

application for disability insurance benefits.  This matter has been referred to the undersigned Magistrate

Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by

Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the

remaining record, the undersigned submits the following Report and Recommendation for the Honorable

Ronald B. Leighton's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is forty-nine years old.[1] Tr. 27.  He has a high school diploma, three years of

_____

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

college education and past work experience as a clerk, an aero-control technician, an aircraft mechanic, and a sheet metal worker. Tr. 112, 117, 122, 127, 1111.

On June 21, 2001, plaintiff filed an application for disability insurance benefits, alleging disability as of July 28, 1998, due to right shoulder arthroscopic debridement, tendonitis, status post clavicle reductions, seizures, and mental disorders. Tr. 27, 83-85, 111, 121, 1110-1111.  His application was denied initially and on reconsideration. Tr. 27-29, 33, 39.  A hearing was held before an administrative law judge ("ALJ") on September 11, 2003, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 1276-1315.  On January 30, 2004, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically that he was capable of performing other jobs existing in significant numbers in the national economy. Tr. 1194-1203.

Plaintiff's request for review was denied by the Appeals Council on August 18, 2004. Tr. 1204. Plaintiff then sought judicial review of the Commissioner's adverse disability determination in federal court, and on February 22, 2005, based on the stipulation of the parties, this Court remanded this matter back to the Commissioner to:

- fully evaluate the medical evidence in the record;
- re-evaluate plaintiff's subjective complaints;
- re-evaluate all of plaintiff's limitations, including his alcohol abuse;
- further evaluate plaintiff's residual functional capacity;
- if a finding of disability is made, further develop the record to determine whether plaintiff has continued to abuse alcohol, and, if so, make findings as to what limitations would remain if such abuse were stopped;
- determine whether evidence from a medical expert is needed regarding the impact of plaintiff's alcohol abuse on his work-related functional capabilities, and the extent those capabilities would improve if he were to stop abusing alcohol; and
- if warranted by the record, obtain supplemental vocational expert testimony regarding plaintiff's assessed limitations and their effect on his ability to do his past relevant work or other work existing in the national economy.

Tr. 1208-10.  Pursuant to the Court's order, on May 9, 2005, the Appeals Council remanded this matter to the same ALJ to conduct the further administrative proceedings noted above. Tr. 1110, 1219-1220.

Another hearing was held before that ALJ on December 1, 2005, at which plaintiff, represented by counsel, appeared and testified. Tr. 1447-1469.  On January 25, 2006, the ALJ issued a second decision,

again determining plaintiff to be not disabled, finding specifically in relevant part:

(1)   at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)   at step two, plaintiff had "severe" impairments consisting of status post right clavicle resection, status post right foot surgery, status post knee surgery, seizures, and alcohol dependence;

(3)   at step three, when plaintiff is using alcohol or drugs, he met the criteria for substance addiction disorder under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00, but none of his impairments met the criteria of any impairment listed therein when not abusing alcohol or drugs;

(4)   at step four, plaintiff had the residual functional capacity to perform a modified range of sedentary work, which precluded him from performing his past relevant work; and

(5)   at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 1124-26.  On September 26, 2006, the Appeals Council declined to assume jurisdiction of the case. Tr. 1103.  The ALJ's decision therefore became the Commissioner's final decision after sixty days. 20 C.F.R. § 404.984.

On October 26, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's second, and most recent, decision. (Dkt. #1-#3)  Specifically, plaintiff argues that decision should be reversed and remanded for further administrative proceedings, for the following reasons:

(a)   the ALJ erred in evaluating the medical source opinion evidence from John Tran, M.D.;

(b)   the ALJ erred in failing to find plaintiff's diagnosed seizure disorder, depression and edema to be severe impairments;

(c)   the ALJ erred in assessing plaintiff's residual functional capacity; and

(d)   the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, and, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 3

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.       <u>The ALJ Properly Evaluated the Medical Opinion Evidence from Dr. Tran</u>

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." <u>Id.</u> at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Id.</u> The ALJ also may draw inferences "logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her.  Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

Plaintiff underwent a psychiatric examination performed by John Tran, M.D., on November 25, 2000.  Plaintiff performed well on his mental status examination at the time, which Dr. Tran expressly noted, although mild anxiousness, restricted affect and only moderate insight was observed. Tr. 313-14, 316.  Nevertheless, Dr. Tran diagnosed him with major depression and a history of methamphetamine abuse in remission, and assessed a global assessment of functioning ("GAF") score of 55. Tr. 315.  In terms of plaintiff's prognosis, Dr. Tran opined in relevant part as follows:

> The claimant . . . has a long history of alcohol and methamphetamine abuse in the past. However, he reported that he has not used any drugs in recent time.  At this time, the claimant is only receiving pharmocotherapy for insomnia, but does not receive any treatment for his depression.  It appears unlikely that his symptoms will improve within the next 12 months if he does not receive additional treatment for depression.  It appears that more aggressive treatment for depression is required for the claimant to improve his condition within the next 12 months.  He is most likely to require pharmotherapy.  Psychotherapy may also appear to be helpful in his condition.

Tr. 315-16.  Dr. Tran also provided the following functional assessment of plaintiff, with reads in relevant part as well:

> The claimant appears to have the ability to perform simple and repetitive tasks.  He may also be able to perform some detailed or complex tasks, at this time.  He should have no problem in accepting instructions from supervisors.  He should also be able to

interact appropriately with co-workers and the public without difficulty, at this time. However, due to the severity of his depressive symptoms, it may be difficult for him to perform work activities on a consistent basis. He would probably require special and additional supervision at this time. It would also be difficult for him to maintain regular attendance in the workplace at this time. He would have difficulty completing a normal workday or workweek without interruptions from his psychiatric condition. The claimant may have some difficulty in dealing with the usual stress encountered in a competitive work environment, at this time, secondary to his severe depression. If the claimant is able to receive more aggressive pharmoctherapy [sic] and possible psychotherapy, his condition will very likely be able to improve in the next few months. At that time, the claimant should have no problem of returning to work based on his psychiatric status.

Tr. 316.

At step three of the sequential disability evaluation process, the ALJ found that when plaintiff "is not using alcohol, his impairment-related functional limitations include only 'mild' restrictions in his activities of daily living and social functioning, and 'moderate' restrictions in his concentration, pace, and persistence." Tr. 1121. The ALJ further stated that "[t]his assessment was firmly based on Dr. Tran's" evaluation of plaintiff, in which he opined that plaintiff "would rapidly improve and be able to return to work in a few months with aggressive mental health treatment," and, as noted above, found that he had performed well on his mental status examination. Id. The ALJ went on to state that "[n]otably" Dr. Tran "assumed" plaintiff "was not currently abusing alcohol, and, thus, did not consider current alcohol abuse" in assessing his functional capabilities. Id. For that reason, the ALJ found that when not abusing alcohol, none of plaintiff's impairments met the criteria for any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[3] Id.

Plaintiff argues the ALJ's rejection of Dr. Tran's findings was based entirely on the assumption that his alcohol use rendered those findings obsolete. Plaintiff asserts this was error, however, because there is no evidence of significant alcohol use for any significant duration at the time of Dr. Tran's evaluation, and the ALJ failed to address this fact. The only acceptable way the ALJ could have reached a determination that alcohol use was material,[4] plaintiff further asserts, was by obtaining the testimony of a

_____

[3] A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination" that the claimant is disabled. Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).

[4] Although plaintiff couches his argument in terms of whether the ALJ properly assessed the extent of his alcohol use, and thus whether it was "material" in this case, the undersigned finds his argument in fact specifically concerns the propriety of the ALJ's analysis of Dr. Tran's medical opinion. Thus, the issue here is not whether plaintiff's alcoholism was "a contributing factor material to the [ultimate] determination of disability," which entails an entirely different type of analysis, but instead whether it was

medical expert regarding documentation in the record of such use and its effect, if any. This the ALJ failed to do, plaintiff argues, and thus there is no substantial evidence to support the ALJ's findings. Lastly, plaintiff argues the ALJ erred as well by failing to follow the order of the Appeals Council requiring medical expert testimony if necessary to determine the effect of his alcohol use on his residual functional capacity.

The undersigned, however, finds plaintiff's argument that the ALJ improperly rejected Dr. Tran's findings to be without merit. First, it must be noted that the plaintiff fails to state which of those findings he asserts the ALJ rejected. Indeed, by finding plaintiff had "'moderate' restrictions in his concentration, pace, and persistence," arguably the ALJ adopted mental functional limitations greater than those that are established by Dr. Tran's evaluation. Again, as noted above and specifically by the ALJ, Dr. Tran opined that "more aggressive" mental health treatment would "very likely" result in plaintiff improving "in the next few months," to the point where he "should have no problem" returning to work. Tr. 316; see Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (to be found disabled claimant has burden of proving he or she suffers from medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for continuous period of not less than twelve months).

Thus, even if plaintiff's assertion that there is no evidence of significant alcohol use in the record at the time of the evaluation, the fact that Dr. Tran felt he would improve shortly with aggressive treatment to the point where he would have no difficulty returning to work on a psychiatric basis, strongly supports the ALJ's determination that plaintiff's mental impairments were far from disabling. Regardless, contrary to plaintiff's assertion, there is plenty of evidence in the record of significant continuing alcohol use during the period surrounding the issuance of Dr. Tran's report. For example, the need for treatment of plaintiff's "drug and alcohol dependency" was noted in late June 2000, and in early August 2000, it was felt that he had "a significant substance abuse problem." Tr. 214, 220; see also Tr. 215. In late August 2000, it was reported that he had "apparently recently fallen back off the wagon again after being sober for some time," and "documented episodes of alcohol withdrawal" were noted as well. Tr. 213, 221.

Many of those documented episodes come from emergency room records. Thus, for example, in early June 2000, upon admittance, plaintiff "smelled of alcohol" and admitted to "chronic drinking." Tr.

material, i.e., relevant, to the ALJ's treatment of Dr. Tran's psychiatric evaluation. See Bustamante, 262 F.3d at 954-55.

REPORT AND RECOMMENDATION

Page - 7

594.  "A companion or significant other" of plaintiff who worked in the hospital at the time "refused to take him home because of his chronic alcoholism and behavior." Id.  A review of plaintiff's systems was "[u]nreliable because of his drinking." Id.  He was diagnosed with "[a]cute ethanolism." Tr. 595.  In mid-October 2000, plaintiff reported he was "not drinking alcohol." Tr. 571.  On January 9, 2001, however, he again was hospitalized for "[a]lcohol intoxication." Tr. 568.  It was observed that he arrived "intoxicated, unable to give any pertinent history," and once more a review of systems was "[d]ifficult" due to his "level of intoxication," although it was noted that he was "a heavy drinker." Id.

The next day, plaintiff reported that he had been "on an alcoholic binge," including drinking "up to four large bottles of wine" per day, "for at least the past five weeks," which would mean since at least early December 2000, less than two weeks after Dr. Tran issued his report. Tr. 562.  Further, it was reported at the same time that plaintiff had maintained sobriety for two years after going through an alcohol treatment program "in about 1996," after which "he started drinking again and went on the above binge," indicating he continued to drink up to and through the time he was evaluated by Dr. Tran. Id.  Plaintiff's "significant alcohol withdrawal syndrome" was noted as well, and he underwent detoxification on his request. See Tr. 565; see also Tr. 548-49, 552, 557.  In late February 2001, he again was admitted for "[a]cute inebriation," reporting that he had "persisted with chronic alcohol use." Tr. 537; see also Tr. 538-39.

In early March 2001, plaintiff stated he had "quit drinking" alcohol. Tr. 811.  In early April 2001, however, plaintiff reported he had quit just "last week," and his "chronic history of alcoholism" once more was noted, Tr. 512.  He was diagnosed as having "[a]lcoholic withdrawal" at that time. Tr. 513, 517.  In late May 2001, plaintiff reported drinking "about one fifth of vodka daily" and/or "a fifth of whiskey or more per day," and had "increased his drinking over the past many days." Tr. 488, 490.   It was felt he was "having problems with alcohol withdrawal." Tr. 486; see also Tr. 469, 491, 494.  At the end of July 2001, plaintiff reported to one treatment provider that he had "not had any ethanol products in the last month," although some of his symptoms at the time raised "suspicion" regarding that claim. Tr. 430-31.  At the same time, he told another such provider that he last used alcohol only "two weeks ago," though again the treatment provider was "unsure" whether it was "true or not." Tr. 433, 435.

While plaintiff informed a third treatment provider in early August 2001, that he had "quit drinking

approximately a month ago" (Tr. 418), it was noted by yet another provider that he had "a history of some alcohol abuse with binging up until two weeks ago" (Tr. 818).  The record makes clear, furthermore, that plaintiff's statements regarding his history of alcohol use were completely at odds with the prior report he had given to Dr. Tran.  Specifically, he told Dr. Tran that he "last used alcohol in October 1996," denying "any alcohol use" since then. Tr. 313.  Dr. Tran's evaluation indicates the only evidence he had regarding plaintiff's alcohol use came from his own reported history. Tr. 315.  As such, the ALJ had a much better perspective on the evidence in the record regarding this issue.

Given plaintiff's inconsistent remarks concerning the nature of his alcohol use and the observations of his treatment providers during the period from early June 2000 through early August 2001, therefore, it was far from unreasonable for the ALJ to have found plaintiff had continued to abuse that substance at the time of Dr. Tran's evaluation.  This finding is  particularly reasonable given plaintiff's own self-report in early January 2001, which, as discussed above, indicates he had gone on a five-week drinking binge that began in early December 2000, less than two weeks after Dr. Tran evaluated him, and likely had continued to drink to a significant degree for the two years prior thereto.

As to plaintiff's argument that the only way the ALJ could have found that the evidence of alcohol use documented in the record was material to Dr. Tran's evaluation and findings was via the testimony of a medical expert, the undersigned disagrees.  As discussed above, contrary to plaintiff's assertion, the record contains plenty of documented evidence, including his own self-reports, contradictory as they were, that he continued to abuse alcohol for the more than one-year period prior to and after the date Dr. Tran issued his report.  Given that Dr. Tran clearly was unaware of this history, and that other contemporaneous medical opinion sources in the record observed significant health-related impacts as a result thereof, the ALJ was not remiss in discounting Dr. Tran's findings on this basis. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (ALJ's duty to further develop record triggered only when there is ambiguous evidence or when record is inadequate to allow for proper evaluation of evidence).  Even so, however, it once again must be noted that Dr. Tran nevertheless found plaintiff would experience no psychiatric difficulties in going back to work within a few months if he were to receive aggressive mental health treatment.  Thus, at least to that extent, the issue of the materiality of plaintiff's alcohol use here is moot.

II.       The ALJ's Step Two Findings

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff has the burden of proving that his "impairments or their symptoms affect his ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  The step two inquiry described above, however, is a de minimis screening device used to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

A.    Seizures

Plaintiff argues the ALJ erred in failing to find that his seizure disorder was a severe impairment and that his seizures were the result of alcohol use or failure to take prescribed medication.  However, the ALJ expressly stated that plaintiff's seizures was a medically determinable severe impairment. Tr. 1120, 1125.  In addition, the undersigned finds the substantial weight of the evidence in the record supports the following findings made by the ALJ, which plaintiff challenges:

> [S]ignificant weight is given to . . . the various emergency room attending physicians who diagnosed and treated the claimant's multiple seizures, as well as their opinions strongly linking these episodes to alcohol withdrawal and/or subtherapeutic levels of prescribed medications.  In particular, significant weight is given to Dr. [Greg] Bell's assessments in view of his neurosurgical specialty and examination of the claimant on two occasions immediately following seizure activity.  On both occasions, Dr. Bell concluded that the claimant's seizures were likely due to alcohol withdrawal and diagnosed him with chronic alcohol abuse.

Tr. 1120.

Plaintiff specifically challenges the significant weight the ALJ gave to Dr. Bell's opinions, asserting that when viewed in the context of a period encompassing seven years, those assessments hardly amount to overwhelming evidence that his seizures were all the result of alcohol use or medication non-compliance.  This, plaintiff asserts, is another reason why the testimony of a medical expert was clearly required.  Again, however, the undersigned disagrees.  As noted by the ALJ, the findings of the medical

sources who treated plaintiff in the emergency room support his determination that the seizures were strongly linked to both his alcohol withdrawal and his less than full compliance with prescribed medications.  In early June 2000, for example, plaintiff was seen in the emergency room for "[n]ear syncope," which was found to be secondary to "[a]cute ethanolism with narcotic pain medicine ingestion." Tr. 594-95.  At that time, plaintiff stated he had "not had a seizure for years" prior to this episode. Tr. 594.

In early January 2001, plaintiff was found to be at "[h]igh risk for DT's [delirium tremens] and alcoholic seizures." Tr. 564.  During another visit to the emergency room in late February 2001, plaintiff "had a distinct odor of alcohol," and the following was noted:

> No documented seizure activity.  Review of his old chart shows no documented history of seizures, although he says that he has been on seizure medications in the past. Because of his heavy drinking and erratic medications, they have not refilled his medications in the past. He . . . has had DTs and withdrawals in the past, but no documented seizures. . . . His son came and . . . documented and confirmed that he had no history of seizures.

Tr. 537.  Because "[t]here was no sign of anti-seizure medicine," and because of plaintiff's "[c]hronic and acute alcoholism," a diagnosis of "seizure" was "[p]ossibly" ruled out, and instead "[i]t was assumed he may have had an alcohol seizure." Tr. 539.  It further specifically was noted that plaintiff was "[n]ot taking his medicine as prescribed." Id.

Plaintiff arrived at the emergency room on April 7, 2001, reportedly "following 2 seizures" that he experienced that day, but he also stated he "had missed a couple of days of his Dilantin," though he further stated he had taken it that morning. Tr. 511-12.  Plaintiff was diagnosed with "[a]lcoholic withdrawal" and "[s]eizures not on adequate dose of Dilantin." Tr. 513.  To a different treatment provider plaintiff saw that day, he "confirmed that he had been taking his medicine intermittently." Tr. 517.  Once more, plaintiff was diagnosed with alcohol withdrawal and "[s]eizures, breakthrough due to not taking medicine responsibly." Id.  While it was noted on May 28, 2001, that plaintiff "came in with history of grand mal seizure," and that he apparently had one at home, it was reported as well that he "had not been taking his medicines for four to five days," and also was drinking "one fifth of vodka daily." Tr. 485, 490.

Another treatment provider commented in late May 2001, that plaintiff reported "he 'forgot' to take his Dilantin" for the past two days, although plaintiff also believed he had not had anything to drink during that time. Tr. 488.  The treatment provider further commented that "[e]arly on it became very clear" plaintiff "could have had a seizure from multiple etiologies, specifically alcohol withdrawal and non-

1   compliance with seizure medication." Id.; see also Tr. 491, 494.  Similar findings were made at the end of

2   July 2001, as well, while plaintiff's seizures specifically were noted to be "alcohol related" back in early

3   June 2001. Tr. 431, 809.  In late October 2002, plaintiff was seen in the emergency room after once more

4   suffering from seizure activity. Tr. 832.  It was noted at that time that he had "been found to do well with

5   and have good control of his seizures on medication," but then "self discontinued" his medication "about

6   two months ago because he simply got tired of taking it." Id.

7          Other medical evidence in the record further supports the ALJ's determination concerning the link

8   between plaintiff's seizures and his alcohol withdrawal and issues with medication compliance.  In mid-

9   June 2001, plaintiff was diagnosed by one examining physician with a "[h]istory of seizure disorder with

10  noncompliance in the past with medications." Tr. 811.   In mid-August 2002, another examining physician

11  also diagnosed him with "[s]eizures secondary to subtherapeutic Dilantin levels." Tr. 802.  In late August

12  2002, a third examining physician diagnosed plaintiff with "[s]eizure disorder, unclear etiology, possible

13  ETOH withdrawal." Tr. 711.  In mid-July 2003, a fourth such physician suspected plaintiff's "[h]istory of

14  seizure disorders" were secondary to alcohol consumption. Tr. 920.  The same history of alcohol related

15  seizures  was noted by yet another examining physician in late July 2003 (Tr. 916), and a sixth one noted

16  that possible connection as well (Tr. 914).

17         All of the above findings are consistent with the two assessments provided by Greg Bell, M.D.  As

18  noted above, in early January 2001, plaintiff was hospitalized and found to be "[h]igh risk for impending

19  DT's and alcoholic seizures" (Tr. 564), which had followed "a prolonged ethanol binge with symptoms

20  consistent with ethanol withdrawal syndrome" (Tr. 548).  Plaintiff apparently had been "drinking 4 bottles

21  of wine per day on admission." Id.  Dr. Bell diagnosed plaintiff with "[m]etabolic encephalopathy, likely

22  due to alcohol withdrawal and possible alcohol encephalopathy." Tr. 549.  In late July 2001, Dr. Bell again

23  examined plaintiff, noting he had a "longstanding history of ethanol abuse and recent seizure disorder." Tr.

24  430.  Although plaintiff "adamantly" denied "recent alcohol consumption," he exhibited symptoms which

25  raised Dr. Bell's "suspicion." Tr. 431.  Dr. Bell therefore diagnosed him with "[s]eizure disorder, possibly

26  alcohol related, question alcohol withdrawal seizures." Id.

27         Accordingly, the undersigned finds that Dr. Bell's two assessments, along with the other medical

28  opinion source evidence in the record discussed above – which dates from early June 2000 through late

1   July 2003 – constitutes substantial and consistent evidence that, as the ALJ found, plaintiff's seizures

2   likely were due to his alcohol withdrawal or medication non-compliance.  The undersigned thus further

3   rejects plaintiff's contention that the ALJ erred in characterizing Dr. Bell's two assessments as

4   "overwhelming evidence" that his seizures were all due to these causes.  Indeed, this is not what the ALJ

5   actually found.  Rather, in the context of rejecting the findings of Judy Ozuna, A.R.N.P., the ALJ stated:

> Less weight is given to Nurse Ozuna's opinions, however.  Not only did she
> inappropriately assume that the claimant was being completely candid about his
> claimed abstinence from alcohol and compliance with medication – contrary to
> overwhelming evidence in the record to the contrary [sic] – she is also not an
> acceptable medical source under the [Social Security] Regulations, as nurse
> practitioners are not listed [as "acceptable medical source"] in 20 CFR § 404.1513(a).
> Even assuming that Ms. Ozuna's opinions qualify as "other medical source" under 20
> CFR § 404.1513(d) and/or she was part of a medical treatment team that addressed the
> claimant's seizures, it is not at all clear from the medical evidence that her opinion
> relating the claimant's seizures to causes *other than* alcohol withdrawal or missed
> medication reflects the opinion of the medical treatment team.  Instead, Ms. Ozuna is
> the only medical source to make this assertion, but this opinion is not shared by any
> other acceptable medical source in the record.

13  Tr. 1120.  Thus, the "overwhelming evidence in the record" the ALJ spoke of, merely concerned evidence

14  of plaintiff's lack of candor regarding his alcohol use and medication compliance.  As can be seen from the

15  above discussion, the ALJ was not remiss in so finding.  This is particularly true given that plaintiff has not

16  challenged the ALJ's determination regarding his credibility, or lack thereof.

17      Plaintiff's challenge to the other stated reasons the ALJ gave for rejecting Ms. Ozuna's findings

18  and opinions is without merit as well.  In early January 2003, and again in early August 2003, she opined

19  that some of plaintiff's seizures "related to alcohol abuse and others have been related to missing doses of

20  his antiepileptic medication."  Tr. 845, 871.  Plaintiff first argues her opinions here should be given weight

21  due to the fact that she was part of a medical team, including physicians who were acceptable medical

22  sources. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996) ("acceptable medical sources" include

23  licensed physicians, not nurse practitioners); 20 C.F.R. § 404.1513(a), (d).  But plaintiff points to no

24  evidence in the record that, as specifically noted by the ALJ, she actually was part of such a team, or that,

25  even if she was, that her opinions reflected those of others on her team.

26      Next, plaintiff points to the fact that Ms. Ozuna found some of his seizures to be unrelated to his

27  alcohol use or missed medication.  But, again, this point is meaningless without reference to the remainder

28  of the medical record.  That record, as discussed above, clearly shows that the vast majority, if not all, of

1  the physicians who examined and treated plaintiff found his seizures or seizure-like symptoms were due to

2  either his alcohol withdrawal or his medication non-compliance or, at the very least, there was at least the

3  question of whether they were due to one or both of those causes.  Thus, given the fact that Ms. Ozuna is

4  the only opinion source to specifically find otherwise, the ALJ did not err in rejecting her opinion in favor

5  of the substantial weight of the many licensed medical doctors in the record who found to the contrary.  See

6  Gomez, 74 F.3d at 970-71 (Commissioner may accord opinions from other sources less weight than those

7  from acceptable medical sources).

8          B.        Depression

9          Plaintiff argues the ALJ erred in not finding his depression to be a severe impairment.  The ALJ's

10  decision does contain contradictory findings in this regard.  While the ALJ did not include depression as a

11  severe impairment in the formal findings section of his decision (Tr. 1125), he did find that impairment to

12  be severe in the body thereof (Tr. 1120).  Given that the ALJ found plaintiff to have moderate restrictions

13  in his concentration, persistence and pace at step three of the sequential disability evaluation process (Tr.

14  1121) as discussed above, and limited him to simple, routine tasks, as discussed in further detail below (Tr.

15  1125), the undersigned finds the severity finding contained in the body of the decision to reflect the ALJ's

16  true determination on this issue, and thus adopts it as such.  Indeed, plaintiff appears to acknowledge this

17  latter fact himself (see Plaintiff's Opening Brief, p. 21, n. 6), and other medical opinion source evidence in

18  the record supports such a finding (see Tr. 372, 376).  Accordingly, the undersigned fails to find any error

19  here, or, if there is, it is harmless.  See Batson v. Commissioner of the Social Security Administration, 359

20  F.3d 1190, 1197 (9th Cir. 2004) (applying harmless error standard); Curry v. Sullivan, 925 F.2d 1127, 1131

21  (9th Cir. 1990) (holding ALJ committed harmless error).

22          It is true that an error will be deemed harmless only if it is "inconsequential" to the ALJ's "ultimate

23  nondisability determination."  Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th

24  Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability

25  conclusion).  Given that the ALJ did find plaintiff's depression to be severe in the body of his decision,

26  and went on to find he had certain mental functional limitations at step three and with respect to his

27  residual functional capacity, any error made at step two was irrelevant to the ALJ's ultimate disability

28  decision.  Although plaintiff does challenge the accuracy of the mental functional limitations the ALJ

1   included in his residual functional capacity assessment, which shall be addressed below, the fact is the ALJ

2   did consider them and their effect on his ability to work, and thus any error the ALJ may have made in his

3   formal step two findings here were inconsequential.

4   Plaintiff also argues the ALJ erred in not further developing the record by sending him out for a

5   consultative mental examination, with psychological testing, to more clearly delineate the nature and

6   extent of his mental impairments.  The undersigned disagrees.  As discussed above, the ALJ's duty to

7   further develop the record is triggered only when there is ambiguous evidence in the record, or when the

8   record is inadequate to allow for proper evaluation of the evidence.  See Mayes, 276 F.3d at 459.  Neither

9   of these factors, however, is present here.  As discussed above, the evidence indicates plaintiff's

10  depression indeed was severe, and the ALJ appears to have found as much, notwithstanding the seeming

11  ambiguity he created in his formal findings.  That is, the evidence in the record itself is not ambiguous on

12  this issue, nor is that evidence inadequate for proper resolution thereof.

13  Plaintiff does argue that at the time of the hearing, over five years elapsed since he was evaluated

14  by Dr. Tran.  But this fact does not establish a need for further development of the record via a

15  consultative evaluation.  Rather, to create the type of ambiguity or evidentiary inadequacy that would

16  trigger such a need, there must be some indication of changed circumstances or other occurrence during

17  the interim that brings the medical evidence that is in the record into question.  No such showing has been

18  made.  Lastly, plaintiff argues the ALJ erred in ignoring and/or overlooking the fact that he was prescribed

19  anti-depressant medication.  The mere prescribing of medication alone though is not necessarily indicative

20  that plaintiff has a severe mental impairment.  While being prescribed such medication may be indicative

21  that plaintiff did have symptoms warranting treatment, it does not establish the presence of work-related

22  limitations that would have more than a minimal effect on his ability to work.

23  C.   Edema

24  In addition to his seizures and depression, plaintiff argues the ALJ erred in not finding his edema to

25  be a severe impairment.  Specifically, plaintiff points to an emergency room report authored by Douglas L.

26  Hayden, M.D., on August 16, 2003, in which it was noted he had edema "bilaterally somewhat worse on

27  the left than the right leg."  Tr. 904.  The etiology of plaintiff's edema was "unclear," however, and no

28  other no significant related findings were made. Tr. 904-05.  Dr. Hayden diagnosed plaintiff with

"[b]ilateral leg swelling of undetermined etiology," stating further that he was "to elevate his legs." Tr. 905.

The ALJ acknowledged Dr. Hayden's findings and recommendation regarding elevation of the legs, and stated he was giving it "some weight." Tr. 1120.  However, the ALJ noted that the report consisted of only a "one-time observation" of plaintiff's edema. Id.  Thus, the ALJ later found that while Dr. Hayden had recommended plaintiff elevate his legs, he concluded that "this common sense restriction" appeared to be "situational only, and not an ongoing restriction." Tr. 1122.  Although plaintiff challenges the ALJ's interpretation of Dr. Hayden's report, the undersigned finds no error here.

First, plaintiff asserts that Dr. Hayden's recommendation is situational only in the sense that he was required to lift is legs when they were swollen.  Plaintiff further contends that the record is not clear as to how many times a day and for how long on each day the swelling occurs which would require elevation of his legs.  The medical evidence in the record, however, supports the ALJ's conclusion that the elevation of plaintiff's legs was not an ongoing situation.  For example, in late July 2001, plaintiff was found to have merely "trace edema in the lower extremities," with no apparent restrictions due thereto. Tr. 431.  In late July 2002, edema again was noted in plaintiff's lower extremities, but his sensation and motor strength were both found to be intact. Tr. 787.  Edema once more was found in early August 2002, but both plaintiff and the nurse who treated him felt that things were "getting better." Tr. 735, 737-38, 761.

Indeed, by late August 2002, plaintiff reported that his symptoms, including his right leg pain, had improved, and that the swelling in that leg had "totally resolved." Tr. 716.  The physician who treated him also noted that the edema in his right lower extremity was "resolving." Id.  On July 19, 2003, less then one month prior to the report issued by Dr. Hayden, furthermore, plaintiff was found to have full strength in his extremities, with no edema found. Tr. 917.  Nor was any edema found in plaintiff's lower extremities upon examination two days later. Tr. 913.  While edema was noted once more in late August 2004, it was found to be "mild." Tr. 1405.  Indeed, plaintiff's "pedal edema" was reported to be controlled by late September 2004. Tr. 1394.  No other reports of edema, or restrictions stemming therefrom, are found in the record.  As such, the recommendation made by Dr. Hayden that plaintiff lift his legs, does not appear to constitute an on-going restriction, particularly in light of the subsequent evidence in the record indicating his edema had come under control and was resolved.

Plaintiff also takes issue with the ALJ's statement that he was giving the recommendation made by Dr. Hayden some weight, but leaving the Court to speculate what weight, if any, in fact was given. But, as discussed above, the ALJ did give some weight to Dr. Hayden's recommendation, he specifically found the evidence in the record showed it to be situational only, not an on-going restriction. As explained above, this finding was proper. Plaintiff further argues the ALJ erred by failing set forth in the assessment of his residual functional capacity any limitations resulting from the need to elevate his legs. But, again, given the propriety of the ALJ's findings here, he was not required to do so.

III.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

> The claimant retains the residual functional capacity to perform the exertional demands of sedentary work, or work that requires lifting no more than 10 pounds. The claimant is also able to stand and/or walk for a total of 2 to 4 hours during an 8-hour workday, sit for a total of 6 hours in an 8-hour workday, and he has no restriction in stooping. The claimant has occasional postural limitations regarding crawling, crouching, kneeling, squatting, and climbing stairs, with constant limitations regarding climbing ladders. The evidence also supports a finding that he is unable to engage in any overhead lifting and is limited to simple, routine tasks.

Tr. 1125; see also Tr. 1122 (explaining further that plaintiff retains such residual functional capacity only when not using drugs or alcohol). Plaintiff argues that given the errors the ALJ made in failing to find his

1   seizures, depression and edema to be severe impairments, the ALJ failed to factor into the above residual

2   functional capacity assessment all of his limitations stemming therefrom as well.  However, as discussed

3   above, the ALJ found plaintiff's seizures to be severe, and the undersigned further adopted the findings in

4   the body of the ALJ's decision indicating he deemed plaintiff's depression to be severe as well.  Also as

5   discussed above, the ALJ did not err in finding his edema to be non-severe.  Accordingly, the ALJ did not

6   err in assessing plaintiff's residual functional capacity on this basis.

7          Plaintiff further argues the ALJ's failure to incorporate the effects of these impairments into the

8   above residual functional capacity assessment constitutes error, even if the ALJ had properly found them

9   to be non-severe.  With respect to plaintiff's seizures and edema, the undersigned disagrees.  Plaintiff

10  points to no specific work-related limitations stemming from these impairments that are supported by the

11  record.  Indeed, as discussed above, the ALJ properly found Dr. Hayden's recommendation that plaintiff

12  lift his legs did not constitute an ongoing restriction, and the medical evidence in the record showed

13  plaintiff's edema had resolved and was being controlled.  Similarly, plaintiff points to, and no medical

14  source in the record has opined as to, any particular work-related limitations resulting from this

15  impairment.  In addition, also as discussed above, the ALJ did not err in finding plaintiff's seizures to be

16  strongly linked to, and thus primarily the result of, his alcohol withdrawal or failure to comply with

17  prescribed medication, and that the record simply did not support the contrary opinions of Ms. Ozuna.

18         On the other hand, the undersigned finds the record does contain medical evidence indicating that

19  plaintiff may have additional mental functional limitations the ALJ should have taken into account.  While

20  the ALJ included a restriction to "simple, routine tasks," for example, he did not properly explain why he

21  limited plaintiff to only that particular mental functional limitation.  As discussed above, Dr. Tran found

22  plaintiff had a number of mental functional limitations, including the limitation to simple and repetitive

23  tasks. Tr. 316.  Although, also as discussed above, the ALJ gave valid reasons for discounting Dr. Tran's

24  report, it is not clear why he chose to adopt the simple, routine tasks limitation, but not any of the others

25  found by Dr. Tran.  It seems clear, furthermore, that the ALJ based this mental functional limitation on Dr.

26  Tran's report, because no other medical source in the record opined as to such. See Tr. 376, 378 (two non-

27  examining psychologists finding plaintiff not significantly limited in his ability to understand, remember

28  and carry out short, detailed and complex instructions).

1    In addition, the record contains a psychiatric review technique form and mental residual functional

2    capacity assessment form completed by Terilee Wingate, Ph.D., in mid-December 2000, and affirmed by

3    Thomas Clifford, Ph.D., in late November 2001.  These two non-examining psychologists found plaintiff

4    to be moderately limited in his ability to maintain attention and concentration, perform activities within a

5    schedule, maintain regular attendance, and be punctual. Tr. 376.  As with Dr. Tran's assessment, the ALJ

6    found that "the DDS psychologist assumed" plaintiff was not currently abusing alcohol, and thus, did not

7    consider such abuse in his or her assessment. Tr. 1121.  However, it is not clear whether the ALJ is

8    referring to Dr. Wingate or Dr. Clifford here, or to another psychologist.  Even if the ALJ was referring to

9    Drs. Wingate and Clifford though, they both noted that plaintiff might not be credible regarding his

10   alcohol abuse and "narcotics seeking behavior." Tr. 370, 374.  Accordingly, this was not a valid basis for

11   rejecting the other mental functional limitations they found.

12   The undersigned does not find here that the additional mental functional limitations found by Drs.

13   Tran, Wingate and Clifford should have been adopted by the ALJ, and thus included in his assessment of

14   plaintiff's residual functional capacity.  Rather, the undersigned merely finds that on remand the opinions

15   of those medical sources should be re-considered to determine whether any of those additional limitations

16   should be so adopted and included.

17   IV.    The ALJ's Step Five Findings

18   If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

19   process the ALJ must show there are a significant number of jobs in the national economy the claimant is

20   able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e).  The

21   ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's

22   Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240

23   F.3d 1157, 1162 (9th Cir. 2000).

24   An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

25   posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

26   1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

27   medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

28   Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

1   by the medical record." <u>Embrey</u>, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

2   that description those limitations he or she finds do not exist. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th

3   Cir. 2001).

4        The ALJ also has the affirmative responsibility to ask the vocational expert about possible conflicts

5   between his or her testimony and information in the Dictionary of Occupational Titles ("DOT"). <u>Haddock</u>

6   <u>v. Apfel</u>, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704.  Before relying on

7   evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ is

8   required to "elicit a reasonable explanation for any discrepancy" with the DOT. <u>Haddock</u>, 196 F.3d at

9   1087; SSR 00-4p, 2000 WL 189704 *1.  The ALJ also must explain in his or her decision how the

10  discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4.

11       The ALJ did not call a vocational expert to testify at plaintiff's second hearing.  At the first

12  hearing, the ALJ did call one, asking her to assume that plaintiff was limited to "a sedentary range of work

13  with no overhead reaching" and "simple routine tasks." Tr. 1306.  In response, the vocational expert

14  testified that plaintiff could perform the jobs of telemarketer and surveillance system monitor. Tr. 1306-07.

15  Based on the testimony provided by the vocational expert in the first hearing, the ALJ found plaintiff to be

16  capable of performing both jobs, and thus not disabled at step five of the sequential disability evaluation

17  process. Tr. 1124-25.  Plaintiff asserts the ALJ erred in relying on such testimony in so finding, arguing

18  that testimony conflicted with the descriptions of the above two jobs contained in the DOT, and the ALJ

19  did not resolve those conflicts.  The undersigned agrees.

20       Specifically, plaintiff argues the jobs of telemarketer (DOT 299.357-014) and surveillance system

21  monitor (DOT 379.367-010) are both described by the DOT as requiring a general education development

22  ("GED") reasoning development level of 3, which is defined as follows:

23       Apply commonsense understanding to carry out instructions furnished in written, oral,
         or diagrammatic form.  Deal with problems involving several concrete variables in or
24       from standardized situations.

25  DOT, Appendix C.  Plaintiff further argues that a restriction to simple, routine tasks is equivalent to a GED

26  reasoning development level of 1, which the DOT defines as:

27       Apply commonsense understanding to carry out simple one- or two-step instructions.
         Deal with standardized situations with occasional or no variables in or from these
28       situations encountered on the job.

REPORT AND RECOMMENDATION
Page - 20

Id.  In addition, plaintiff asserts that while the DOT describes the job of telemarketer as requiring a specific vocational preparation ("SVP") of 3, which is defined as "[o]ver 1 month [of vocational preparation[5]] up to and including 3 months," and which plaintiff claims is semi-skilled work, while the ALJ found that he had no transferrable skills or transferability of skills was not an issue. Tr. 1125; DOT, Appendix C.  For these reasons, plaintiff contends he is incapable of performing either job.

Defendant concedes that because the telemarketer job has an SVP of 3, and thus is a semi-skilled position, plaintiff is incapable of performing that job, because it conflicts with the ALJ's finding that he is restricted to simple, routine work.  Defendant argues, however, that because the job of surveillance system monitor is defined as having an SVP of 2 (which requires "[a]nything beyond short demonstration up to and including 1 month"), and because an SVP of 2 is consistent with a restriction to simple, routine tasks, there is no inconsistency between the vocational expert's testimony and the DOT's description of that job. The undersigned disagrees.

Defendant argues plaintiff's assertion that the GED is not the only aspect of the DOT that addresses a job's simplicity, and his claim that a GED reasoning level of 3 is inconsistent with a restriction to simple, routine work, is based on an incorrect premise about how the GED component corresponds to the factors considered by the Commissioner at step five of the sequential disability evaluation process, and incorrectly represents what the DOT's GED actually reflects.  Rather, defendant asserts the GED merely represents the education level, both formal and informal, achieved by an individual, and thus is not indicative of the tasks or nature of the particular job defined in the DOT.  For example, defendant points out in this case plaintiff has a high school education, took two years of college education and was three credits shy of obtaining his degree in drafting, and engaged in prior work as a licensed aircraft mechanic, which the DOT describes as requiring a GED reasoning level of 4.  See Defendant's Brief, Exhibit A, DOT 621.281-014.  Considering plaintiff's prior work history and his high school education, which defendant argues is equivalent to a GED reasoning development level of 3, defendant asserts plaintiff has the requisite GED reasoning development level to perform the job of surveillance system monitor.

Defendant's argument is unpersuasive.  It is true that the DOT's GED "embraces those aspects of

---

[5]The DOT expressly defines "specific vocational preparation" as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C.

1    education (formal and informal) which are required of the worker for satisfactory job performance," and

2    that "[t]his is education of a general nature which does not have a recognized, fairly specific occupational

3    objective." DOT, Appendix C.  In addition, "[o]rdinarily, such education is obtained in elementary school,

4    high school, or college," but it also "may be obtained from experience." Id.  The specific requirements of

5    the DOT's GED reasoning component, however, further concerns, for example, a worker's ability to deal

6    with problems and variables and understand and carry out instructions of varying complexity.  In assessing

7    a particular job's GED reasoning requirements in the manner advocated by defendant though, the Court

8    would need only look to the worker's educational and prior work history, and would not necessarily have

9    to consider that worker's present reasoning abilities.

10    This manner of approaching the DOT's GED reasoning component, furthermore, runs counter to

11    logic and common sense.  For example, in this case, the ALJ expressly found, based on the testimony of

12    the vocational expert, that plaintiff lacked the residual functional capacity to perform his past relevant

13    work (Tr. 1123), which includes his prior work as an aircraft mechanic.  If this is so for purposes of step

14    four of the sequential disability evaluation process, than it is difficult, to say the least, to see how the ALJ

15    can use that same work history at step five to find plaintiff capable of performing other work.  In addition,

16    despite defendant's attempt to do so, nothing in the description of the DOT's GED reasoning level of 3

17    indicates that it is necessarily equivalent to a high school education, particularly one, again as in this case,

18    obtained many years ago, an issue addressed in further detail below.

19    Defendant next accuses plaintiff of muddling, contrary to the Commissioner's regulatory scheme,

20    step five vocational factors with the ALJ's residual functional capacity finding.  That scheme, defendant

21    asserts, considers vocational factors, such as education, prior work experience and age, separate from a

22    claimant's residual functional capacity, which is the maximum level of work the claimant can do in a work

23    setting despite his mental and/or physical impairments.  Defendant argues further that a claimant's residual

24    functional capacity can include the ability to perform unskilled or simple work, which is distinct from what

25    may be taken into consideration under the vocational factor of education.  While it is true that the factors

26    of education and residual functional capacity are dealt with separately in the Social Security Regulations,

27    they are not as distinct in all cases as defendant asserts, and defendant's argument, as noted by plaintiff,

28    suffers from a faulty premise.  That is, defendant erroneously equates unskilled work with the residual

functional capacity restriction to simple, routine tasks.

In attempting to so equate the two, defendant relies on the definition of unskilled work contained in the Commissioner's regulations, which is work "which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).  A job is deemed unskilled if "a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." Id.; see also SSR 00-4p, 2000 WL 1898704 *3 ("[U]nskilled work corresponds to an SVP of 1-2.").  Defendant also points to the Commissioner's regulatory definition of a high school and above education, which means in relevant part "abilities in reasoning . . . acquired through formal schooling at a 12th grade level or above," and a person with such an education who generally is considered to be someone who "can do semi-skilled through skilled work." 20 C.F.R. § 404.1564(b)(4).

As discussed above, the mere fact that a claimant has a high school education does not necessarily in itself equate to an ability to perform at a GED reasoning level of 3.  The Commissioner's regulations themselves recognize that the level of formal education attained is not in all instances determinative with respect to representing the "actual educational abilities" of an individual:

> The importance of your educational background may depend upon how much time has passed between the completion of your formal education and the beginning of your physical or mental impairment(s) and by what you have done with your education in a work or other setting.  Formal education that you completed many years before your impairment began, or unused skills and knowledge that were a part of your formal education, may no longer be useful or meaningful in terms of your ability to work.  Therefore, the numerical grade level that you completed in school may not represent your actual educational abilities.  These may be higher or lower.  However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities.

20 C.F.R. § 404.1564(b). Here, in addition to the fact that it appears much time has passed since plaintiff obtained his formal education (see Tr. 1297-98), the above regulatory language clearly contemplates that educational background may no longer be an accurate indicator of an individual's educational abilities as the result of  an impairment's subsequent commencement.  In other words, with respect to this last point, a claimant's current residual mental functional capacity may call into question or, indeed, lower the level of reasoning development that otherwise could be inferred by an individual's formal education.

Defendant's argument, furthermore, is at odds with other courts who have considered this issue.  As noted by plaintiff, the Ninth Circuit has not decided this issue.  However, at least one other district court in this circuit, faced with a substantially similar situation and argument made by the Commissioner,

has done so, resolving the issue as follows:

> Key to the present case is the ALJ's finding that Meissl's ailments limited her to work involving simple tasks performed at a routine or repetitive pace.  Meissl asserts that such a restriction is inconsistent with her ability to perform any of the other work as the descriptions of those jobs in the Dictionary of Occupational Titles ("DOT") require a higher reasoning capacity than that allowed by the ALJ's RFC.

> Meissl argues that the rub comes from the fact that the other work, which the ALJ pointed to as something which she could perform and, hence, the reason for denying her benefits, requires a level of reasoning beyond that contemplated as "simple, repetitive."

> The DOT describes the stuffer job as requiring a reasoning level of two out of a six-point scale.  A level two reasoning indicates that the job requires the person to be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and "[d]eal with problems involving a few concrete variables in or from standardized situations." DOT 1011 (4th ed. rev. 1991).  This leaves the question of whether such a reasoning level is consonant with a limitation to simple, repetitive mental tasks.

> The Commissioner argues that it does, but does so by pointing to a separate vocational consideration listed in the DOT-a job's specific vocational preparation ("SVP") score.  The stuffer job is considered an unskilled one under the DOT's SVP scores.  The Commissioner contends that because the job had an SVP level of two, which essentially is unskilled work, the vocational expert's opinion does not conflict with the DOT. . . .  Unskilled work is defined under Social Security regulations as requiring little or no judgment to do simple duties that can be learned on the job in a short period of time.  *See* 20 C.F.R. § 416.968(a).  Because the job duties for Meissl's work as a stuffer would be simple ones, the Commissioner posits that the reasoning required to perform those jobs must necessarily be simple as well and, hence, not in conflict with the ALJ's "simple, repetitive" functional restriction.

> The problem for the Commissioner is that she is conflating two separate vocational considerations.  Other courts decided that, contrary to the Commissioner's argument here, the SVP level in a DOT listing indicating unskilled work, does not address whether a job entails only simple, repetitive tasks. *See, e.g., Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir.1997); *Cooper v. Barnhart*, 2004 WL 2381515, at *4 (N.D.Okla. Oct.15, 2004); *Hall v. Barnhart*, 2004 WL 1896969, at *3 (D.Me. Aug.25, 2004).  A job's SVP is focused on "the amount of lapsed time" it takes for a typical worker to learn the job's duties. DOT at 1009. A job's reasoning level, by contrast, gauges the minimal ability a worker needs to complete the job's tasks themselves.  As one court noted, "SVP ratings speak to the issue of the level of vocational preparation necessary to perform the job, not directly to the issue of a job's simplicity, which appears to be more squarely addressed by the GED [reasoning level] ratings." *Hall-Grover v. Barnhart*, 2004 WL 1529283, at *4 (D.Me. April 30, 2004).  Here, the one vocational consideration directly on point with the limitation contained in the RFC is a job's reasoning level score.

<u>Meissel v. Barnhart</u>, 403 F.Supp.2d 981, 982-83 (9th Cir. 2005) (footnote and internal citations omitted).

The undersigned finds the reasoning of the above district court's opinion, and that of the other courts cited and quoted therein, persuasive, and hereby adopts it. <u>See, e.g., Cooper</u>, 2004 WL 2381515 at *4 ("The explanations of SVP in the DOT suggest that the SVP specifies the vocational preparation required to

perform a job.  The reasoning level . . . appears more similar to whether or not a claimant has a limitation to performing only simple tasks.").

Indeed, this appears to be the approach taken by other circuit courts as well.  The Eighth Circuit, for example, has noted that:

> The Social Security's own list of unskilled sedentary jobs . . . indicates that many jobs within this range require more than the mental capacity to follow simple instructions. For each job described, the *Dictionary of Occupational Titles* specifies the type of reasoning capabilities the job requires. 2 U.S. Dep't of Labor, *Dictionary of Occupational Titles*, 1010-11 (4th ed. 1991).  For instance, a job rated reasoning level one requires the ability to understand and carry out simple instructions, whereas a job rated reasoning level two requires the ability to understand and carry out detailed instructions. *Id.* at 1011.  Many of the jobs listed require level two reasoning or higher in the unskilled sedentary job category.

Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997).  Indeed, in addressing the specific job at issue here, the Tenth Circuit more recently held as follows:

> The DOT states that both surveillance-system monitor and call-out operator require a reasoning level of three, defined as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [, and d]eal with problems involving several concrete variables in or from standardized situations." DOT, Vol. II at 1011; *see id.*, Vol. I at 281 (categorizing surveillance-system monitor as requiring level-three reasoning); *id.* at 207 (same with regard to call-out operator).
>
> Plaintiff argues that her RFC, as found by the ALJ, is incompatible with jobs requiring a reasoning level of three.  The ALJ's findings with regard to Plaintiff's RFC include: "Mentally, [Plaintiff] retains the attention, concentration, persistence and pace levels required for simple and routine work tasks." Aplt. App., Vol. II at 32.  This limitation seems inconsistent with the demands of level-three reasoning. *See Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir.1997) (rejecting contention that a claimant limited to following only simple instructions could engage in the full range of sedentary work because many unskilled jobs in that category require reasoning levels of two or higher).  We note that level-two reasoning requires the worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations." DOT, Vol. II at 1011.  This level-two reasoning appears more consistent with Plaintiff's RFC.

Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005).  The undersigned agrees with the Tenth Circuit that jobs such as surveillance system monitor, which require a reasoning level of 3, is incompatible with a residual functional capacity restriction to simple, routine work.[6]  Accordingly, because the ALJ did not ask

---

[6]The undersigned disagrees with plaintiff's assertion that the Tenth Circuit "did not address the fact that reasoning level 1 defined 'simple' tasks" in stating that "level-two reasoning appears more consistent" with a limitation to "simple and routine work tasks." Plaintiff's Reply Brief, p. 6; Hackett, 395 F.3d at 1176.  While it is true the Tenth Circuit did not address specifically that particular GED reasoning development level, plaintiff's assertion implies the Tenth Circuit did not mean what it said in regard to the DOT's GED reasoning development level of 2.  Nevertheless, while the undersigned has found previously that simple, routine work is more analogous to a GED reasoning level of 1, a determination as whether the ALJ's restriction to simple, routine work in this case equates to a GED reasoning level of 1 or 2 is unnecessary – and, for that reason, the undersigned declines to do so at this time – as the job of surveillance system monitor, as noted above, requires a GED reasoning level of 3.

REPORT AND RECOMMENDATION
Page - 25

the vocational expert whether her testimony regarding the job of surveillance system monitor varied from the description of that job contained in the DOT, or acknowledge and resolve any such variance, he erred. See Hall-Grover, 2004 WL 1529283 at *4.

Defendant further argues, however, that nothing in the DOT's description of the tasks involved in performing the job of surveillance system monitor conflict with a restriction to simple, routine tasks. The DOT's description of those tasks reads as follows:

> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

DOT 379.367-010. Clearly, a number of these tasks reasonably can be viewed as being more than simple and routine. These include, for example, monitoring premises for the purpose of detecting crimes, using closed circuit television equipment to accomplish the same, and determining when to notify the appropriate authorities. Such tasks arguably are not "routine" in nature, and likely require a level of judgment above that needed to perform simple tasks.

Lastly, defendant contends such a finding would in essence equate the description of the DOT's GED reasoning development levels with the actual tasks required to perform the particular job identified. Thus, for example, defendant argues that because the DOT's description of the job of surveillance system monitor also requires a GED mathematical development level of 1, an individual would have to perform all of the following specific tasks set forth therein:

> Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

Id. Similarly, because a GED language development level of 3 also is required for the job of surveillance system monitor, the individual would have to perform such tasks as "[r]ead a variety of novels, magazines, atlasses, and encyclopedias" as well. Id. Defendant asserts that such an interpretation of the DOT's GED requirements clearly would be unreasonable, and the undersigned agrees.

But defendant's interpretation of the DOT's GED requirements is not the only possible one, and, as just noted, is in no sense a reasonable one. Equally implausible is the take on those requirements

REPORT AND RECOMMENDATION
Page - 26

1    defendant would have the Court make.  That is, defendant appears to argue, as discussed above, that all the

2    Court has to do is look to an individual's past educational and work history, and not consider any other

3    factors that might call into question the applicability of that history, including the passage of time and the

4    individual's current residual mental functional capacity.  This, other courts, also as discussed above, have

5    declined to do, and the undersigned declines to do so here as well.

6         Rather, a more reasonable approach is to view the sub-categories of the DOT's GED section – e.g.,

7    reasoning, mathematics, language (including reading) – as a general description of the level of ability that

8    is required to perform acceptably in each such area.  Indeed, the fact that the DOT employs the term

9    "level" to further separate out the different levels of ability encompassed within these sub-categories

10   supports this approach.  Clearly this is the case for the sub-category of reasoning.  For example, the ability

11   to "[a]pply commonsense understanding" and "[d]eal with problems involving several concrete variables"

12   involved in level 3 reasoning are too general in nature to ever be seen as the actual tasks required for any

13   particular job.  Instead, this is the general level of reasoning any such tasks must not surpass.  Similarly, to

14   use defendant's examples, a job requiring level 1 math and level 3 reading does not mean that performing

15   operations with units and reading novels is a particular task of every job defined as being performed at

16   such levels, but that the actual tasks involved therein may not be performed at a level greater than those

17   described in the math and reading sub-categories listed therefor.

18        Accordingly, for the reasons set forth above, the undersigned finds the ALJ erred in determining

19   that plaintiff was capable of performing the job of surveillance system monitor.  Plaintiff argues that the

20   ALJ erred by not calling a vocational expert to testify at the second hearing, in light of the conflict

21   between the first vocational expert's testimony and the DOT's description of the surveillance system

22   monitor job.  As discussed above, the ALJ did err in failing to ask the first vocational expert about, and

23   then to resolve, the inconsistencies between her testimony and that DOT description.  Whether or not the

24   ALJ should have done this through the testimony of a second vocational expert, he erred in not resolving

25   the discrepancies prior to issuing his second decision.  As such, the undersigned agrees with plaintiff that

26   further testimony from a vocational expert is needed on remand to address this issue.  Further, if on

27   remand plaintiff also is found to suffer from the additional mental functional limitations discussed above,

28   the Commissioner shall decide as well whether vocational expert testimony is needed to determine

     whether he can perform other work existing in significant numbers in the national economy in light

REPORT AND RECOMMENDATION
Page - 27

1     thereof.

2     V.     <u>This Matter Should Be Remanded for Further Administrative Proceedings</u>

3          The Court may remand this case "either for additional evidence and findings or to award benefits."

4     <u>Smolen</u>, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course,

5     except in rare circumstances, is to remand to the agency for additional investigation or explanation."

6     <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in

7     which it is clear from the record that the claimant is unable to perform gainful employment in the national

8     economy," that "remand for an immediate award of benefits is appropriate." <u>Id.</u>

9          Benefits may be awarded where "the record has been fully developed" and "further administrative

10     proceedings would serve no useful purpose." <u>Smolen</u>, 80 F.3d at 1292; <u>Holohan v. Massanari</u>, 246 F.3d

11     1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
> evidence, (2) there are no outstanding issues that must be resolved before a
> determination of disability can be made, and (3) it is clear from the record that the ALJ
> would be required to find the claimant disabled were such evidence credited.

<u>Smolen</u>, 80 F.3d 1273 at 1292; <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because

issues still remain with respect to plaintiff's residual mental functional capacity and his ability to perform

other work existing in significant numbers in the national economy, this matter should be remanded to the

Commissioner for further administrative proceedings.

<u>CONCLUSION</u>

         Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

further administrative proceedings in accordance with the findings contained herein.

         Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

the parties shall have ten (10) days from service of this Report and Recommendation to file written

objections thereto. <u>See also</u> Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those

objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit

imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **November 9,**

**2007**, as noted in the caption.

         DATED this 15th day of October, 2007.

1

2

Karen L. Strombom
United States Magistrate Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28